UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:17-cr-293-MOC-DCK-1

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Vs.** | ) | ORDER |
| | ) | |
| | ) | |
| **TIMOTHY ANTHONY MOORE,** | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court on Defendant's pro se Motion for Compassionate Release/Reduction of Sentence, (Doc. No. 37), and on his Motion to Appoint Counsel, (Doc. No. 40). The Government has responded in opposition to both motions.

**I.     BACKGROUND**

**A.  Defendant's Criminal History**

Defendant is serving a 108-month sentence after pleading guilty in this Court to conspiring to distribute and possess with intent to distribute 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). (Doc. No. 29). Defendant has a long criminal history that preceded his current sentence. Defendant was previously convicted of various drug, weapons, and assault charges, including: (i) carrying a concealed weapon; (ii) possessing marijuana; (iii) assault on a female; and (iv) possessing cocaine with intent to sell/deliver, for which he received a four-year state prison sentence. (Doc. No. 21 at 6-9). In 1994, he was convicted in this Court of conspiracy to possess with intent to distribute cocaine base, possessing with intent to distribute cocaine base, and possessing a firearm during and in relation to a drug trafficking crime. (Id. at 10). In that case, Defendant served as a leader/organizer in a drug trafficking conspiracy

1

responsible for distributing approximately 40 kilograms of cocaine base in the Charlotte area. (Id.). During the conspiracy, Defendant carried firearms on several occasions, threatened individuals by pointing firearms at them, "pistol-whipped" individuals, and shot at someone over an outstanding drug debt. (Id.). This Court initially sentenced Defendant to life imprisonment, but the Court twice subsequently reduced Defendant's sentence. (Id.).

While serving his first term in federal prison, Defendant conspired to have someone smuggle marijuana into the prison. (Id. at 11). Prison authorities caught him with approximately 96 grams of marijuana inside the prison. (Id.). Consequently, he ultimately pleaded guilty in the U.S. District Court for the Eastern District of Virginia to possessing contraband in prison. (Id.). He received a ten-month sentence, to run consecutively to the federal prison sentence he was already serving. (Id.).

Defendant was released from federal prison on his first two federal cases on April 25, 2014. (Id. at 10–11). Less than three years after spending approximately 20 years in federal prison for drug trafficking, Defendant engaged in the drug trafficking conspiracy giving rise to the instant case.

After the Court sentenced Defendant in the instant case, he filed a motion for a reduced sentence based on Amendment 782 to the U.S. Sentencing Guidelines and/or the First Step Act. (Doc. Nos. 34, 35). The Court denied the motion because he had already received the benefit of Amendment 782 at his sentencing and because the First Step Act's reductions of enhanced penalties pursuant to 21 U.S.C. §§ 841 and 851 did not apply to him. (Doc. No. 36).

Defendant is currently 55 years old and serving his sentence at Federal Correctional Institution Jesup, in Jesup, Georgia ("FCI Jesup"). He has served approximately one-third of his sentence. See (Attachment 2 (BOP Inmate Profile), at 3). BOP currently projects his release date as July 13, 2025. (See id. at 1, 4). Defendant has not incurred any disciplinary infractions in BOP

while serving his current term. See (Attachment 3 (BOP Disciplinary Record)). But he committed several disciplinary infractions during his first federal prison term—in addition to his federal conviction for smuggling marijuana into prison—including: (i) consuming alcohol; (ii) concealing tobacco; (iii) possessing intoxicants; (iv) possessing pornography; (v) being absent from various assignments; and (vi) forging another inmate's name on a telephone request form. See id.

### B. Impact of COVID-19 on FCI Jesup

There are presently 1,346 inmates at FCI Jesup, including 873 inmates at the FCI, 383 inmates at a low security satellite prison, and 90 inmates at a minimum-security satellite camp. See Federal Bureau of Prisons, FCI Jesup, available at https://www.bop.gov/locations/institutions/jes/. FCI Jesup currently reports no inmates positive for COVID-19. See Federal Bureau of Prisons, COVID-19 Cases, available at https://www.bop.gov/coronavirus/. FCI Jesup currently reports 19 staff members positive for COVID-19. Id. Additionally, FCI Jesup reports that one inmate and no staff members have died from COVID-19, while 252 inmates and three staff members have recovered from COVID-19. Id.

### C. Defendant's Medical History

Based on a review of Defendant's medical records, he suffers from chronic lower back pain, possible lumbar radiculopathy,[1] elevated prostate-specific antigen ("PSA"), non-cardiac chest pain, and elevated bilirubin.[2] See Attachment 4 (BOP Medical Records for Past Year), at 2. His medical records reflect "[n]o evidence for diabetes at this time." Id. An elevated PSA can be an indicator of prostate cancer. See Mayo Clinic, PSA Test, available at

---

[1] Lumbar radiculopathy, also known as sciatica, is a disease involving the lumbar spinal nerve root, resulting in pain, numbness, or weakness of the buttock and leg. It can be treated by physical therapy, medications, injections, and/or surgery. See Emory Healthcare, Lumbar Radiculopathy, available at https://www.emoryhealthcare.org/orthopedics/lumbar-radiculopathy.html.

[2] Elevated bilirubin can be an indicator for a variety of liver problems. See Mayo Clinic, Bilirubin Test, available at https://www.mayoclinic.org/tests-procedures/bilirubin/about/pac-20393041.

3

https://www.mayoclinic.org/tests-procedures/psa-test/about/pac-20384731. But records from medical exams on January 31, 2020, and September 18, 2019, indicate that Defendant's prostate was normal. See (Attachment 4 (BOP Medical Records for Past Year), at 42, 51, 65). Moreover, Defendant refused a urology consult for his elevated PSA in 2019, noting that prostate cancer "do[es] not run in my family." (Id. at 2, 3, 138–40). He also refused the flu vaccine in September 2019. (Id. at 108). The medical records also note that Defendant "denie[d] family history of cancer." (Id. at 3).

Defendant's most recent medical exam on August 6, 2020, found that, except for the issues noted above, Defendant's major health systems were working within normal limits, including his cardiovascular and pulmonary systems. (See id. at 3-10). During the same visit, Defendant reported being satisfied with his current regimen of duloxetine and ibuprofen to treat his back pain. (Id. at 3, 9). His medical provider prescribed him aspirin for prediabetes and duloxetine and ibuprofen for his back pain. (Id. at 9). According to Defendant's medical records, he was playing basketball as recently as December 2019. (See id. at 30, 46, 57 (medical visits for finger injured while playing basketball)). At the time of his sentencing in this case in early 2018, the only health issue Defendant reported was back pain. See (Doc. No. 21 at 19).

On July 4, 2020, and August 25, 2020, Defendant requested that the prison warden recommend him for a compassionate release sentencing reduction. (Doc. No. 37 at 5-6). In support of his requests, he asserted that he had completed forty percent of his sentence, that he had a solid release plan, that he was employable, and that he was remorseful for his crimes and rehabilitated. (Id.). His only mention of his medical conditions was a request to the warden to "check my medical records if doing so will be beneficial to this request." (Id.). Defendant also requested that the warden recommend a compassionate release sentencing reduction on July 12, 2020, and August 5, 2020. See (Attachment 5 (Compassionate Release Requests to Warden)). In

those requests, he asserted that he has completed between forty and fifty percent of his sentence, and that he has medical issues that make him particularly vulnerable to COVID-19, including high blood pressure, high cholesterol, and kidney problems. (Id.). On August 26, 2020, Defendant's warden denied his request, explaining that he has no medical restrictions, is not enrolled in any chronic care clinics, and has no debilitating condition or terminal illness. (See Attachment 6 (Warden's Compassionate Release Denial), at 1). An email attached to his warden's denial notes that Defendant "is not in chronic care clinic for anything that the CDC considers high risk for severe illness with Covid 19 infection" and that he "does not have any physical restrictions and is independent with his activities of daily living." (Id.).

### D. Defendant's Pending Motions

On September 1, 2020, Defendant filed the pending motion for compassionate release. (Doc. No. 37). Then, on September 25, 2020, he filed the pending motion to appoint counsel to assist him in his compassionate release motion. (Doc. No. 40). In his motion for compassionate release, Defendant argues that he is particularly vulnerable to COVID-19, asserting that the CDC considers his medical conditions "high risk" for COVID-19. (Id. at 1). He asserts that he has been diagnosed with having traces of prostate cancer and liver infection, and that he has a family history of liver cancer, including that his mother died of liver cancer. (Id.). He asserts that he tested positive for tuberculosis and that he suffers from back arthritis. (Id.). He notes that he takes aspirin, ibuprofen, and duloxetine to treat his medical conditions. (Id.). He argues that social distancing is difficult in his prison setting. (Id. at 3). He also asserts that COVID-19 is "surging" in FCI Jesup, with "over 200 inmates that have contracted the virus with deaths." (Id.). He argues that he is more likely to contract COVID-19 in prison than outside of prison. (Id.). He also asserts that he poses "no danger to the public" and that he poses "little risk of recidivism." (Id.). Finally, he asserts that he has "no disciplinary infractions" and that he is a "model Prisoner who has served

5

over 50% of [his] sentence effectively." (Id.).

## II. DISCUSSION

### A. Motion to Appoint Counsel

There is no general constitutional right to appointed counsel in post-conviction proceedings. See Pennsylvania v. Finley, 481 U.S. 551, 555 (1987); United States v. Williamson, 706 F.3d 405, 416 (4th Cir. 2013). Instead, the Court has discretion to appoint counsel in proceedings under 18 U.S.C. § 3582(c) if the interests of justice so require. See United States v. Legree, 205 F.3d 724, 730 (4th Cir. 2000); see also United States v. Reed, 482 F. App'x 785, 786 (4th Cir. 2012); cf. 18 U.S.C. § 3006A(a)(2)(B) (providing interests of justice standard for appointment of counsel in similar post-conviction proceedings). Here, Defendant has not established that the interests of justice require appointment of counsel. Defendant's compassionate release motion and the Government's response in opposition demonstrate that Defendant has made four requests for compassionate release to his warden, in addition to filing a compassionate release motion with this Court. In his requests and motion, Defendant adequately sets forth his bases for compassionate release, largely emphasizing a variety of asserted medical conditions rendering him vulnerable to COVID-19. Thus, Defendant's compassionate release requests and his motion demonstrate that he is capable of requesting compassionate release without the assistance of counsel.

Accordingly, the Court denies Defendant's request for appointment of counsel.

### B. Motion for Compassionate Release

The relevant part of the compassionate release statute permits this Court "after considering the factors set forth in section 3553(a) to the extent that they are applicable" to reduce Defendant's sentence only if finds that (1) "extraordinary and compelling reasons warrant such a reduction"; "and" (2) "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The applicable "policy statement" appears

6

in section 1B1.13 of the Sentencing Guidelines Manual. That section and its commentary describe the "circumstances" under which "extraordinary and compelling reasons exist." U.S.S.G. § 1B1.13 & cmt. (n.1). First, the defendant must not be "a danger to the safety of any other person or to the community." Id. Second, one of four specific circumstances must exist involving, for example, the medical condition of the defendant, his age, his family circumstances, or reasons "determined by the Director of the Bureau of Prisons." U.S.S.G. § 1B1.13, cmt. (n.1). One of these circumstances requires that the defendant suffer from "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. (n.1(A)(ii)(I)).

To the extent Defendant's arguments are based on a generalized risk of contracting COVID-19, this is not an extraordinary and compelling reason warranting early release. As the Third Circuit reasoned in United States v. Raia, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." 954 F.3d 594, 597 (3d Cir. 2020). If it did, every inmate would have a justification for compassionate release. That is, "speculation as to whether COVID-19 will spread through Defendant's detention facility…, whether Defendant will contract COVID-19, and whether he will develop serious complications, does not justify the extreme remedy of compassionate release." United States v. Shah, Case No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020) (denying compassionate release where defendant claimed diabetes and hypertension, but facility had no cases).

Defendant has not identified a medical condition that falls within one of the categories specified in the policy statement's application note, and his asserted condition does not itself rise to the level of severity required under the policy statement. Defendant's medical records indicate that

7

he suffers from a few common minor medical conditions and that he has not been diagnosed with any serious disease.[3] Moreover, Defendant's minor health conditions are being appropriately and effectively managed inside BOP. Defendant's medical conditions do not include any of the conditions identified by the CDC as heightening the risk of severe injury or death were he to contract COVID-19. The only conceivable CDC risk condition he presents is that an elevated bilirubin, which may indicate some type of liver problem. But any such liver problem is undiagnosed and unspecified. And even if he were diagnosed with liver disease, CDC has merely identified liver disease as a condition that might increase a person's risk of severe illness from COVID-19, rather than placing it in the higher risk category. In any case, based on Defendant's medical records and on his warden's statement that he is not medically restricted in any way, Defendant's medical condition does not present (i) any terminal illness, or (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of Defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). This is particularly true given that Defendant's prison facility, FCI Jesup, currently has no inmates positive for COVID-19. For these reasons, Defendant has failed to establish an "extraordinary and compelling reason" for a sentence reduction under Section 3582(c).

Second, Defendant has failed to show that his circumstances are extraordinary and compelling in light of the factors set forth in 18 U.S.C. § 3353(a). Defendant's prior criminal history, particularly his prior federal drug trafficking conviction and sentence, weighs heavily against a sentence reduction. As noted, Defendant was often armed and committed violence during his two federal drug cases, and he continued to deal drugs while on bond and even while in federal

---

[3] The Government notes in its response that, despite that Defendant claims he tested positive for tuberculosis, the medical records do not show any diagnosis of tuberculosis.

8

prison. Moreover, releasing Defendant from prison now would reduce the Court's sentence by approximately two-thirds. Given Defendant's extensive history of drug dealing and his prior federal drug trafficking conviction, granting compassionate release would result in a sentence that would be inconsistent with the factors set forth in 18 U.S.C. § 3553(a), including resulting in a sentence that fails to promote respect for the law. Finally, Defendant has not demonstrated that he would not be a danger to the safety of another person or to the community if he were to be released early.

Having thus considered defendant's motion and reviewed the pleadings, the Court enters the following Order.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Compassionate Release/Reduction of Sentence, (Doc. No. 37), and Defendant's Motion to Appoint Counsel, (Doc. No. 40), are both **DENIED**.

Signed: October 15, 2020

*[Signature]*
Max O. Cogburn Jr
United States District Judge